**SO ORDERED.**

**SIGNED this 13 day of October, 2010.**



_____
**JANICE MILLER KARLIN**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In re: ) | |
| ) | |
| **NORVAL SEBERT FORTUNE, III** and ) | **Case No. 09-41744** |
| **KARLA JO FORTUNE,** ) | **Chapter 13** |
| ) | |
| Debtors. ) | |
| _____ ) | |
| **NORVAL SEBERT FORTUNE, III** and ) | |
| **KARLA JO FORTUNE,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **Adv. No. 10-7003** |
| ) | |
| **AMERICAN WINDOW & SIDING SYSTEMS,** ) | |
| **INC.** and **COMMUNITY HOME FINANCIAL** ) | |
| **SERVICES INC.,** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM ORDER AND OPINION

This matter is before the Court on the Complaint filed by Plaintiffs, Norval and Karla Fortune

("Fortunes"), which seeks entry of judgment for alleged violations of the Home Ownership and

Equity Protection Act of 1994[1] ("HOEPA") and the Truth in Lending Act[2] ("TILA") arising out of a financial transaction that financed improvements to the Fortunes' home. The Court has jurisdiction to enter a final judgment in this adversary proceeding because it is related to a bankruptcy proceeding, and the parties have consented to the trial and entry of a final order by this Court.[3] The Court has now heard the evidence at trial, and is prepared to rule.

## I.     FINDINGS OF FACT

On or about November 20, 2006, a salesman from American Siding and Window Systems, Inc. ("American") made an unsolicited visit to the Fortunes' home and sold them home remodeling services totaling $26,691 on their principal residence. The services consisted of replacement windows and doors, as well as the installation of siding. The Fortunes are below median income individuals who before this transaction were making monthly payments of $226 to buy this property, which they purchased under an installment contract in 2001 for $14,200. The interest rate on that contract was 9.5%.[4] Mr. Fortune's only income was $836 a month from Social Security disability, and Ms. Fortune's monthly gross income was $1,918.

To finance these improvements, Debtors agreed to apply for a loan, which would be secured by a mortgage on their home in the amount of $26,985.35, with interest of 17.99%. When American determined that Debtors were actually purchasing the home on contract and were not the title owners, American was unable to obtain a mortgage without paying off the underlying encumbrance

---

[1] 15 U.S.C. §§ 1602(aa) and 1639.

[2] 15 U.S.C. § 1601 *et seq.*

[3] *See* 28 U.S.C. § 157(c)(2) (jurisdiction to enter final orders in proceedings related to bankruptcy matters with the consent of the parties) and Pretrial Order at ¶ 2, Doc. 47 (consent of the parties).

[4] Pretrial Order Stipulation ¶ 6E, Doc. 47.

2

and adding that loan payoff to the balance the Fortunes would need to repay. Accordingly, American needed to also finance the payoff of the contract, which resulted in an increase in the total amount financed. The total amount ultimately financed was $32,776.67, again at 17.99% interest.

On January 11, 2007, after most of the work had been completed, a representative from American again came to the Fortunes' home and asked them to sign a "Home Improvement Retail Installment Contract, Security Agreement and Disclosure Statement"[5] ("Contract"). In that Contract, the Fortunes agreed to borrow that $32,776.67 to pay for the home improvements. The document indicates the "Seller" is American.

Debtors agreed to make 20 years, or 240 months, of payments of $504.61 each to repay the loan. Page four of the Contract contains a section entitled "Assignment by Seller" in which American, as the seller, assigns its rights under the Contract, and its interest in any collateral, to Community Home Financial Services, Inc. ("Community"). As part of this consumer credit transaction, American obtained a mortgage on the Fortunes' home. American then immediately assigned that mortgage, along with the Contract, to Community on January 18, 2007.[6]

In exchange for the assignment, Community sent a check payable only to American in the amount of $32,482.83. In other words, the check was not payable jointly to the Fortunes and American, as Debtors contend the law requires. Neither Community nor American established an escrow account for payment to American for the work done on the Fortunes' home.

Although the written Contract was clearly between the Fortunes and American, there was some dispute as to whether American or Community was the true lender. This dispute was clearly

---

[5]Exhibit J14.

[6]Exhibit J42.

3

fueled by the numerous documents provided to the Fortunes that expressly identify Community as "the lender." These documents include a Section 32 Mortgage Disclosure, a Good Faith Estimate - RESPA, a Settlement Statement, a Federal Truth-in-Lending Statement,[7] a Borrower Application,[8] a Privacy Policy and Disclosure document,[9] and a Request for Verification of Employment for both of the Fortunes.[10] Each of these documents clearly lists Community as the lender rather than American.

This discrepancy between the disclosure documents and the actual Contract concerning the true identity of the lender was explained by the testimony of Mr. Dickson, president of Community. Dickson explained that Community, along with several other similar lenders around the country, does not actually write the loans for home improvement contracts to the homeowner. Instead, the loans are made between the builder (in this case American) and the homeowner, although Community does pre-approve the transactions. Community then agrees to purchase the loans from the builder through an assignment of both the contract rights and the mortgage. Assuming the correct paperwork has been properly processed, and the work completed in a manner satisfactory to the homeowner,[11] Community then purchases the loan.

Community allows remodeling companies with whom it frequently transacts business, like American, to use its forms to help ensure that all laws and regulations regarding disclosures are

---

[7]Exhibits J2 through J5, respectively.

[8]Exhibit J9.

[9]Exhibit J11.

[10]Exhibits J12 and J13.

[11]Mr. Dickson routinely performs a recorded telephone interview with the borrower to ensure that all the work has been completed to the homeowner's satisfaction. That interview was done with Mr. Fortune, only. *See* Exhibit J39 (transcript of telephone interview).

4

followed.  Although the much preferred method would be to allow businesses like American to use the forms that Community uses, but without designating Community as the actual lender, the Court finds that in this case the Contract was clearly between American and the Fortunes, and then assigned to Community.

Included in the disclosure documents is one entitled "Section 32 Mortgage Disclosure;" its purpose is to provide clear written notice to the homeowners that they are not required to complete the contract merely because they were given the disclosures.  It further discloses that if they obtain the loan, the lender will hold a mortgage on their home and that they could potentially lose their home, and any equity accumulated in that home, if they default.  Here, the disclosure document indicated that the annual percentage rate would be 17.99% and that the regular monthly payments would be $416.26.  This document is dated November 21, 2006, and indicates the total finance charge over 240 months would be $72,917.05, with payments totaling $99,902.[12]

There is nothing in the record to establish that any subsequent Section 32 (or other disclosure) form was ever provided to the Fortunes after the amount of the loan was increased to pay off the Department of Veterans Affairs ("VA"), which was the title owner of the property.  In fact, Exhibit J38, which is a worksheet prepared by staff for Community on or about February 5, 2007, indicates the date of the only noted "Section 32" disclosure as November 21, 2006.  This change in the loan transaction after November 21, 2006 resulted in the Fortunes' monthly payment increasing by over 20% to $505.61.  Perhaps even more important, the entire loan was now at 17.99% interest, rather than the 9.5% rate that Debtors had previously been paying on their original loan.  In addition,

---

[12]Exhibit J6.

5

the total finance charges had increased from $72,917.05 to $88,568.73, and the total payments had increased from $99,902.40 to $121,346.[13]

Following the completion of the work and the assignment of the Contract and mortgage to Community, the Fortunes received an informational flier from the Federal Housing Authority indicating they might be eligible to refinance their home mortgage at a lower interest rate. Mr. Fortune contacted the FHA to inquire about this possibility, and was informed by the FHA that he should speak with an attorney because there might be some irregularities in the transaction with American and/or Community. Specifically, the Fortunes were informed by the FHA that the check from Community to American should have been payable to both American and the Fortunes,[14] and that the Fortunes may not have received all of the necessary disclosure forms. It was this contact that precipitated Debtors to seek counsel regarding this transaction.

The Fortunes filed a petition under Chapter 13 of the Bankruptcy Code on October 16, 2009. On October 19, 2009, the Clerk mailed a copy of the Fortunes' Chapter 13 wage earner plan, which contained notice of rescission of the transaction, to both American and Community.[15] Community

---

[13]Exhibit J14.

[14]This advice was from the FHA to the Fortunes. Community disputes that the check had to be payable jointly, as discussed in more detail below.

[15]Doc. 3, ¶ 11 provides (in pertinent part): DEBTORS HEREBY GIVE NOTICE OF RESCISSION OF THE MORTGAGE DESCRIBED BELOW, PURSUANT TO REGULATION Z, 12 C.F.R 226.15, DUE TO VIOLATION OF HOEPA, 15 U.S.C. 1639(I) and 12 CFR 226.34, BY COMMUNITY HOME FINANCIAL SERVICES, INC., to-wit: COMMUNITY HOME FINANCIAL SERVICES, INC., FAILED TO INCLUDE THE NAME OF EITHER DEBTOR ON THE CHECK PAYABLE TO THE CONTRACTOR AMERICAN SIDING & WINDOW SYSTEMS, INC., and FAILED TO ESTABLISH A THIRD -PARTY ESCROW ACCOUNT. That paragraph further provides: THE MORTGAGE AND LIEN ON DEBTORS' REAL ESTATE LEGALLY DESCRIBED AS HIGHLAND CREST #2, BLOCK 16, LOT 15, BRYANT ST BLK 16 LOT 15 HIGHLAND CREST NO 2 SECTION 18 TOWNSHIP 12 RANGE 16 (commonly known as 3413 SE Bryant Street, Topeka, Kansas), HELD BY THE FOREGOING CREDITOR SHALL BE VOID UPON CONFIRMATION OF THE PLAN AND COMMUNITY HOME FINANCIAL SERVICES, INC., SHALL TAKE ALL NECESSARY STEPS TO RELEASE THE MORTGAGE RECORDED AGAINST DEBTORS' HOME. THE INDEBTEDNESS WILL BE PROVIDED FOR AS GENERAL UNSECURED DEBT AND PAID THROUGH THE PLAN (emphasis in original).

6

acknowledged receipt of the Chapter 13 plan containing the notice of rescission by filing a proof of claim with the Court on December 1, 2009. In addition, Community hired counsel to appear at the first confirmation hearing on January 6, 2010, further demonstrating its receipt of the plan prior to that date.[16] The mailing to American was returned with the notation "American Siding & Window moved left no address unable to forward to sender."

In addition to the rescission notice contained in the Chapter 13 Plan, Community also received a separate notice of rescission from each of the Fortunes, mailed to Community on or about January 8, 2010, by their bankruptcy counsel. Community has declined to honor that rescission and has elected not to return any money to the Fortunes as a result of that rescission notice.

Also on January 8, 2010, the Fortunes filed this adversary proceeding claiming that both American and Community had violated HOEPA and TILA. Specifically, the Fortunes claim that American and Community failed to provide them the disclosures required by HOEPA (including new HOEPA disclosures after the loan amount increased), that American and Community failed to establish an escrow account or to make any checks payable to the Fortunes and American, jointly, and that William Dickson, president of Community, made material misrepresentations to Mr. Fortune in a telephone conversation conducted February 7, 2007. The Fortunes argue that these actions by American and Community entitle them to an extended period in which to rescind the transaction, as well as statutory and actual damages for the alleged HOEPA and TILA violations.

Additional facts will be discussed below, when necessary.

## II.    CONCLUSIONS OF LAW

---

[16]Doc. 26 in the main case.

The Fortunes contend that American and Community have violated both the TILA and HOEPA in connection with their claim for damages. American did not file an answer or otherwise respond in this case, and default has been entered against it.[17]

A.    Background information on the TILA

Congress enacted the TILA in 1968 to regulate the disclosure of the terms of consumer credit transactions in order "to aid unsophisticated consumers and to prevent creditors from misleading consumers as to the actual cost of financing."[18] An additional goal was "to deter generally illegalities which are only rarely uncovered and punished, and not just to compensate borrowers for their actual injuries in any particular case."[19] The Act recognized that borrowers are not on an equal footing with creditors in either bargaining power or with respect to credit terms. TILA requires creditors to use a standardized format and terminology defined by the Act to aid consumers, recognizing that proper disclosure under TILA allows consumers to compare different financing options and their true costs.[20]

---

[17]Docs. 31 and 32.

[18]*Morris v. Lomas & Nettleton Co.*, 708 F. Supp. 1198, 1203 (D. Kan. 1989) (citing *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 363-69 (1973)).

[19]*Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475, 480 (5th Cir. 1995).

[20]15 U.S.C. §1601(a). Requiring an accurate price tag for the credit product enables consumers to see the cold, hard figures, in advance over the at least three day "cooling off" period, which may encourage consumer restraint. It is thought some consumers will decide to defer the debt entirely or scale back to avoid the high cost. In addition, requiring "advance-look" and standardized disclosures by all creditors protects ethical credit providers from deceitful competitors, thus invigorating competition. *See* Elizabeth Renuart & Kathleen Keest, *Truth in Lending* § 3.1.1, p. 61 (6th Ed. 2007).

8

To encourage compliance, TILA violations are measured by a strict liability standard. Thus, even minor or technical violations impose liability on the creditor.[21] The consumer-borrower can prevail in a TILA suit without showing that he or she suffered any actual damage as a result of the creditor's violation of the TILA.[22] In addition, the Act is remedial and "should be construed liberally in favor of the consumer."[23]

The Board of Governors of the Federal Reserve System ("the Fed") is the agency charged with administering the TILA,[24] and it has adopted extensive regulations to implement the TILA,[25] referred to as "Regulation Z."[26] When the agency charged with enforcing a statute has promulgated a regulation that adopts a permissible construction of the statute, the courts must defer to that interpretation and not impose their own.[27] Furthermore, the Supreme Court has indicated this requirement is especially strong in the context of the TILA and Regulation Z, where even official staff interpretations of the statute and regulation should control unless shown to be irrational.[28]

---

[21] *See, e.g., Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983) ("To insure that the consumer is protected, as Congress envisioned, requires that the provisions of [the TILA and Regulation Z] be absolutely complied with and strictly enforced."); *Davison v. Bank One Home Loan Servs.,* 2003 WL 124542, *6 (D. Kan. 2003).

[22] *Herrera v. First Northern Sav. & Loan Ass'n*, 805 F.2d 896, 900 (10th Cir. 1986).

[23] *Johnson v. Riddle*, 305 F.3d 1107, 1117 (10th Cir. 2002).

[24] 15 U.S.C. §§ 1602(a) and 1604(a).

[25] 12 C.F.R. Part 226 (2003).

[26] *See id*. § 226.1(a).

[27] *Chevron U.S.A., Inc., v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984).

[28] *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-70 (1980); *see also Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981) (citing *Milhollin*, Court indicated that absent "obvious repugnance" to statute, Fed's regulation implementing TILA and interpretation of that regulation should be accepted by courts) and *Davison v. Bank One Home Loan Servs.,* 2003 WL 124542, at *5 (holding there existed "unmistakable congressional decision to treat administrative rulemaking and interpretation under TILA as authoritative").

9

### 2.    The TILA right to rescind a home mortgage transaction

This proceeding involves a non-purchase money loan secured by a consumer-borrower's home.[29]  In such non-purchase money transactions, the consumer-borrower has a right to rescind established by TILA § 1635.  These TILA rescission provisions reflect Congress' desire to keep homeowners from placing their homes in jeopardy without a clear understanding of the risks and benefits of the transaction.[30]

Section 1635 provides:

> **(a)  Disclosure of obligor's right to rescind**
>      Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction <u>or</u> the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so.  The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section.  The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.[31]

So long as the creditor has not given the obligor the items specified in this provision, the obligor's right to rescind will last three years from the consummation of the transaction, with certain exceptions that do not apply here.[32]  The main part of Regulation Z that implements TILA § 1635 is 12 C.F.R. § 226.23.

---

[29]*See* 15 U.S.C. §§ 1635(e)(1) and 1602(w) (excluding from rescission rights given by § 1635 liens against consumer-borrowers' homes that secure financing of acquisition or initial construction).

[30]*See* U.S. Rep. No. 368, 96th Cong., 2d Sess. 28, *reprinted in* 1980 U.S.C.C.A.N. 236, 264.

[31]15 U.S.C. § 1635(a) (Emphasis added).

[32]15 U.S.C. § 1635(f).

10

The Fortunes now seek monetary damages and to exercise a right to rescind the transaction with Community well after the expiration of the normal three-day rescission period. They contend that they are entitled to an extended rescission period as a result of the errors committed by Community and/or American in providing the required TILA disclosures.

### B.    Background on HOEPA

HOEPA[33] was enacted in 1994 as an amendment to TILA to further protect consumers against various practices in connection with certain high interest rate loans.[34] It was a response to the increase in abusive and predatory lending practices in the home equity lending market,[35] and the approach taken by Congress was to bring most violations of HOEPA within the category of TILA violations triggering extended rescission rights.[36]

The act applies to high-interest rate mortgages in which (I) the annual percentage rate (APR) at consummation will exceed by more than ten percentage points the yield on Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the loan is received by the creditor, or (ii) the total points and fees payable by the consumer at or before loan closing will exceed the greater of eight percent of the total loan amount or $400.[37] HOEPA requires that additional disclosures be made to the consumer no later than three business days prior to loan consummation[38]

---

[33]15 U.S.C. § 1639.

[34]*Lynch v. RKS Mortg., Inc.*, 588 F. Supp.2d 1254, 1260 (E.D. Cal. 2008).

[35]*Truth in Lending*, *supra*, § 1.2.4, p. 7.

[36]*Id.* at § 1.2.8, p. 8.

[37]*Id*.; *see also* 15 U.S.C. § 1602(aa); 12 C.F.R. § 226.32(a)(1).

[38]*See* 15 U.S.C. § 1639(b)(1).

and expanded liability for assignees who purchase loans covered by HOEPA.[39]  The parties have stipulated this transaction is controlled by HOEPA.

HOEPA includes several requirements and prohibitions, only a few of which are relevant here.  Specifically, HOEPA requires the lender to inform the borrower that:

1.    "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application."

2.    "If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home and any money you have put into it, if you do not meet your obligations under this loan."

3.    In the case of a credit transaction with a fixed rate of interest, the annual percentage rate and the amount of the regular monthly payments.[40]

In addition to these disclosure requirements, HOEPA prohibits the inclusion of certain provisions, such as prepayment penalties, balloon payments, and negative amortization.[41]  In addition, when the loan is made in connection with a home improvement contract, HOEPA requires the creditor to either (1) issue any payments in a form that is payable to both the contractor and the borrowers; or (2) at the election of the borrower, issue any payments to a third party escrow agent.[42]

HOEPA also requires new disclosures be provided if the creditor makes any changes to the terms of the extension of credit that make the previous disclosures inaccurate.[43]  In general, these

---

[39] 15 U.S.C. § 1641(d).  Another precipitating cause of HOEPA's extension of liability to assignees was "the industry's increasing use of middlemen to obtain the business, do the preparatory work for a loan application, and close the loan." *Truth in Lending,* § 1.2.5, p 8.  That description seems to aptly describe the nature of the transaction in this case.

[40] *Truth in Lending,* § 1.2.5, p 8.

[41] 15 U.S.C. § 1639(c), (e) and (f).

[42] 15 U.S.C. § 1639(I).

[43] 15 U.S.C. § 1639(b)(2).

12

disclosures must be provided in writing no less than three business days prior to consummation of the transaction, just as is the case with the initial disclosures.[44]  The disclosures can be made over the telephone, but only if (1) the change is initiated by the consumer; (2) at the consummation of the transaction the creditor provides to the consumer the new disclosures in writing; and (3) the creditor and consumer certify in writing that the new disclosures were provided by telephone at least three days prior to the date of consummation of the transaction.[45]

> **C.    The Fortunes failed to overcome the presumption that they each received two copies of the right to rescind, as required by TILA.**

The Fortunes claim that American and/or Community failed to provide each of them with two copies of the notice of their right to rescind.  The starting point for this analysis is the Notice of Right to Cancel, itself, which Debtors admittedly signed on January 11, 2007.  It clearly states, immediately before their signatures, "Each of the undersigned acknowledge receipt of 2 copies each of this notice."[46]  Their signatures, the authenticity of which they both admitted, create a rebuttable presumption that they did each receive the two copies as the form expressly provides.[47]

Under direct examination, Mr. Fortune adamantly claimed that he only received one copy of the notice of right to rescind, and that it was Exhibit J26 (which shows his and his wife's signatures, at the bottom, but no signature on the "I wish to cancel" line on the form).  He testified that he

---

[44]*Id.*  The three-day period gives consumers an unconditional right to change their minds and cancel the transaction for any reason, or for no reason at all.

[45]*Id.*

[46]Exhibit J26.

[47]15 U.S.C. § 1635(c) provides that "Notwithstanding any rule of evidence, written acknowledgment of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof."

specifically remembered the transaction and that he knew that he did not receive more than this one copy. Mr. Fortune further insisted it was this one single copy that he signed and returned to Community as his formal rescission of the transaction.[48]

Under cross examination, however, Mr. Fortune was asked, if his statement was true, where the other copy of the Notice of Right to Cancel had come from that he had used to attempt to rescind the transaction, a copy of which was marked Exhibit J52. Exhibit J52, which the Fortunes had attached as Exhibit B1 to their Complaint to demonstrate their attempt to rescind the transaction, does not have the Fortunes' signature at the bottom (Acknowledgment of Receipt of Forms), but only has their respective signatures on the "cancel" line.[49] Further, the handwritten dates on Exhibit J52 clearly differ from those on J26. He had no reasonable explanation for this discrepancy. Accordingly, the Court finds there is no question that the Fortunes received at least two copies of the Notice of Right to Cancel.

The existence of this second copy of the notice of the right to rescind, with signature and date information different from the other copy produced by the Fortunes, completely undermines Mr. Fortune's testimony, and thus his credibility. Mr. Fortune's insistence that he only received one copy of the document, when he clearly received at least two copies, leads the Court to conclude that at best, Mr. Fortune is unsure of the number of copies he received. Although a debtor seeking to overcome the presumption faces a "low burden,"[50] Mr. Fortune did not overcome that low burden due to his lack of credibility. And Ms. Fortune did not testify how many copies she received, thus

---

[48]Exhibit J52 and Exhibit J53 are identical except J52 has Mr. Fortune's signature on the "cancel" line and Exhibit J53 has Ms. Fortune's signature on that line.

[49]Exhibit B-1 attached to the Complaint (Doc. 1) is identical to Exhibit J52.

[50]*See Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002).

14

she did not rebut the presumption that she received the two copies she acknowledged, in writing, that she received.

Because the Fortunes have the burden of rebutting the presumption that they received the correct number of copies of the notice of the right to rescind, because of their written certification that they obtained the correct number, and because the testimony attempting to rebut this presumption was unpersuasive, the Court finds they have not overcome the presumption. Therefore, the Court finds that the Fortunes have failed to show that Community and/or American violated the TILA by failing to provide each of them two copies of the right to rescind.

### D. The Fortunes failed to show that Community violated HOEPA by not including their names on the check written to American

The next claim asserted by the Fortunes is that Community violated HOEPA by not making the check issued to American jointly payable to them, as well.[51] Community does not dispute that the check was not made jointly payable, but instead contends that the check it wrote was not to fund the transaction between the Fortunes and American, but rather was to purchase the note and mortgage from American, as assignee. Although the effect of the transaction is the same (Community provided money to American that was used to fund the improvements to the Fortunes' home), the distinction made by Community is critical to the outcome of this claim. If the initial transaction was between American and the Fortunes, then there was no check issued that had to be made jointly payable. Under that scenario, Community was not issuing a check to fund the home

---

[51] HOEPA provides an alternative mechanism for funding home improvement loans by allowing for the use of a third party escrow agent. However, this alternative must be at the consent of the consumer, and there is nothing in the record to indicate that the Fortunes sought or approved this option. In addition, the use of a third party escrow agent is an alternative to the requirement that the check be made jointly payable, not an additional requirement. The Fortunes cannot claim violations of HOEPA for both the failure to make the check jointly payable and the failure to use a third party escrow agent. The Court construes their pleadings to seek relief under these theories as being plead in the alternative, rather than as two separate claims.

repairs, but instead was simply purchasing the note from American. However, if Community was actually the lender in the initial transaction, then its failure to issue the check jointly payable to the Fortunes and American was clearly a violation of HOEPA.

The Court finds that this consumer credit transaction was between American and the Fortunes. This finding is certainly complicated by the fact that many of the initial disclosure documents identify Community as the actual lender, rather than American. However, these discrepancies were satisfactorily explained by Community's key trial witness. The critical evidence on this issue is the actual contract itself, which clearly identifies American as the lender, and also contains a separate section that effectively assigns American's interest to Community.[52] In addition, the Fortunes granted a mortgage in favor of American,[53] not Community, although that mortgage was ultimately (and quickly) assigned to Community.[54]

Although the Court agrees with the Fortunes that this financial structure appears to be designed simply to work around certain provisions of HOEPA or to potentially insulate Community from any HOEPA or TILA violations, that motivation does not change the facts of the case. The evidence establishes that the Fortunes entered into a consumer credit transaction with American. Community then purchased the note and mortgage from American. Because Community did not

---

[52]Exhibit J14.

[53]Exhibit J29.

[54]Exhibit J43.

16

directly fund the consumer credit transaction, it was not required to follow the requirements of HOEPA with regard to making the check jointly payable to both the consumer and the contractor.[55]

There was no evidence presented at trial, or arguments made by the Fortunes, that American issued any checks that were not made jointly payable, or that it was required to issue any such checks. Therefore, the Court cannot find that American violated the provisions of HOEPA on this issue.[56]

### E. The Fortunes were not provided with the necessary disclosures under HOEPA, and are entitled to an extended three-year rescission period.

The final claim brought by the Fortunes against American and/or Community is the failure to provide them the necessary disclosures under HOEPA. The record reflects that the Fortunes were originally provided with all of the necessary disclosures for the transaction in November 2006, including the specific disclosures required by HOEPA. However, those disclosures were based upon a loan in the principal amount of $26,985.35. That principal amount, plus interest, resulted in a monthly payment of $416.26. After discovering that the Fortunes did not have actual title to the home, but instead were purchasing it through a contract for deed with the VA, however, American required the Fortunes to allow American to pay off that loan so that the Fortunes would have clear

---

[55] In their Trial Brief, the Fortunes claim that Community, through Mr. Dickson, made certain admissions during a telephone call on February 5, 2007, that shows Community was the lender in this case. Unfortunately, this topic was not addressed at trial. The Court finds that the statements made in the telephone conversation, a copy of the transcript of which was admitted into evidence, without any additional context or explanation, are insufficient to overcome the evidence that American was the actual lender.

[56] The Court notes that any claim for damages against American for such a HOEPA violation would be barred by the statute of limitations, and the Fortunes would only be entitled to an offset claim against it. Such a claim would have no impact on the final judgment in this case, even if the Court could find that American acted erroneously.

Case 10-07003   Doc# 58   Filed 10/13/10   Page 17 of 28

title and would be able to then grant a mortgage to American.[57]  When the payoff of the VA debt was added to the amount for the windows, doors, and siding, the principal amount of the loan increased to $32,777.67.  American (and later Community, through an assignment) was then able to obtain a first mortgage on the property.  With the increased amount financed, however, the Fortunes' monthly payments increased to $505.61.

The statute expressly requires that the disclosure defect be "material," and that term is defined, as follows:

> The term "material disclosures" means the disclosure, as required by this subchapter, of the annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness, and the disclosures required by section 1639(a) of this title.[58]

Further, TILA defines the "advance look" disclosure as material in HOEPA loans.[59]  Accordingly, there is no question that increasing the principal on the loan by $5,791 constitutes a material change in the terms of the agreement under HOEPA.

It is first material because this caused the monthly payments to increase over twenty percent, from $416.26 to $505.61, which is significant, especially for such low-income debtors.  The second way this is material is that it significantly increased—in fact almost doubled—the interest rate the

---

[57] The testimony regarding title to this property was confusing.  The parties' pretrial stipulation ¶ 6E states that there was a "mortgage with Countrywide having an unpaid balance of $5,791.83, an interest rate of 9.5% and monthly payments of $227.59," but there was also testimony (and an exhibit) that the Veterans Administration was a title owner of the property and there was an underlying contract with the VA.  The Court has determined that this factual discrepancy is not material to this decision.

[58] 15 U.S.C. § 1602(u).

[59] *See* 15 U.S.C. § 1602(u) (defining "material disclosure" to include those disclosures required by 15 U.S.C. § 1639(a) (HOEPA disclosures due three days before consummation of the transaction)).

18

Fortunes would have to pay on their original $5,791 home loan, increasing the interest rate from 9.5% to 17.99%. The third way this is material is in the total cost of borrowing. The finance charge increased from $72,917 to $88,568, more than a 20% increase. Finally, the fourth way this is material is that it obligated the Fortunes to pay total payments of $121,346.40 (on a $32,777 loan), rather than total payments of $99,902, as originally disclosed.

These changes clearly made the prior disclosures materially inaccurate. As a result, HOEPA's requirement that new disclosures be provided at least three days in advance of consummation was invoked.[60] The record is completely devoid of any evidence that American or Community provided new disclosures to the Fortunes at least three days prior to the consummation of the transaction on January 11, 2007.

The only evidence presented to show that the Fortunes were informed of this new information is located on the contract itself. Although the initial Section 32 Mortgage Disclosure[61] was adequate to meet the requirements of HOEPA when the loan principal was $26,985, a new disclosure was required once the principal amount of the loan increased. That new disclosure had to be made at least three days prior to consummation of the transaction, and the unrebutted evidence is that the Fortunes first received these disclosures on the actual date of consummation—January 11, 2007. At a result, the Court finds that the Fortunes were not provided all of the disclosures required by HOEPA and TILA, and as a result they are entitled to a rescission period of up to three years.

    **F.**    **The Fortunes are entitled to penalties for the violations of TILA and HOEPA.**

---

[60] 15 U.S.C. § 1639(b)(2). Consummation occurs, generally, at the time the consumer becomes contractually obligated on the credit transaction, which is determined by reference to state law. Community does not argue that the consummation date in this case was earlier than the date the Fortunes signed the note, which was January 11, 2007.

[61] Exhibit J3.

19

The Fortunes seek statutory penalties totaling $28,000 for the alleged violations of the TILA and HOEPA, as well as the amount of all finance charges and fees paid, actual damages and attorney fees. Damages for violations of the TILA, including HOEPA, are governed by 15 U.S.C. § 1640. According to that statute, the Court has the authority to award any actual damages, statutory penalties, and, in the case of a failure to comply with HOEPA, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply was not material.

Because Community is an assignee, it is not automatically liable for statutory penalties and damages resulting from TILA or HOEPA violations. According to 15 U.S.C. § 1641(e), an action for damages under the TILA or HOEPA with respect to a transaction secured by real estate cannot be maintained against an assignee unless the violation for which the action was brought is apparent on the face of the disclosure statement and the assignment was voluntary. In this case, there is no dispute that the assignment to Community was voluntary. The Court must, therefore, only determine whether the violation was apparent on the face of the documents Community received when it elected to purchase the paper from American.

The Court finds that American's failure to comply with HOEPA's disclosure requirement was clearly apparent on the face of the documents. The only Section 32 Mortgage Disclosure, which is a form drafted with the intent to comply with HOEPA's requirements, contained a monthly payment that was not accurate at the time the transaction was finalized in January 2007. Because the monthly payment, the finance charge, and the total of payments required were all substantially increased when the payoff of the first mortgage was included in the amount financed, the HOEPA disclosures had to be corrected and provided to the Fortunes. Most importantly, the statute requires

20

that these accurate disclosures must be provided to the homeowner at least three days prior to consummation of the transaction.

Had Community exercised due diligence in purchasing the loan from American, it would have recognized that the HOEPA disclosures given back in November 2006 did not match the actual amount of the loan or the required monthly payments. It would also have discovered that the required additional disclosures were not provided to the Fortunes at least three days before the loan was closed. Therefore, Community is also liable for any damages resulting from American's failure to comply with HOEPA's disclosure requirements, even though American was the lender that actually failed, in the first instance, to provide the required disclosures.[62]

The Court finds that the Fortunes did not demonstrate at trial what actual damages they suffered from this violation. However, because the action relates to a closed-end credit transaction secured by their home, the Fortunes are entitled to statutory penalties of not less than $400, nor greater than $4,000, for both the failure to provide the necessary disclosures and for the failure to comply with the Fortunes' notice of rescission within 20 days.[63] In addition, because the action involves a violation of 15 U.S.C. § 1639 (HOEPA), the Fortunes are entitled to damages in an amount equal to the sum of all finance charges and fees paid by them, unless the creditor can show that the failure to comply was not material.[64] The Court has already held that the failures were material.

---

[62] Exhibit J38, Community's own Telephone Verification Sheet, which it uses to determine whether it should purchase a loan, clearly shows that the only Section 32 disclosure it relied on was dated "11-21-06."

[63] 15 U.S.C. § 1640(a).

[64] *Id.*

21

Although the Court has the authority to award statutory penalties in the amount of up to $4,000 per violation, the Court finds that statutory penalties in the amount of $2,000 per violation are appropriate. This finding takes into account the fact that although the Fortunes did not establish that these violations caused them actual damages,[65] the violations were significant in nature and are the very kinds of violations Congress intended to curtail. The requirement that the amount of the monthly payment be disclosed, in writing, at least three days prior to the consummation of the transaction, is a significant provision of HOEPA, and American's failure to comply with this requirement (in the form of an amended disclosure after the principal amount was changed) cannot be taken lightly. In addition, the Fortunes would not have been required to initiate and pursue this lengthy adversary proceeding had Community timely recognized and acted upon the notice of rescission.

Although not as egregious as some violations of the TILA and HOEPA, these violations were far from trivial. The $2,000 statutory penalty is imposed, jointly and severally, upon Community and American for the failure to provide the required disclosures under HOEPA. In addition, a $2,000 statutory penalty is imposed upon Community for the failure to timely respond to the Fortunes' notice of rescission, for a total of $4,000 in statutory penalties.

The Court also finds that damages under 15 U.S.C. § 1640(a)(4) are warranted in an amount equal to the sum of all finance charges and fees paid by the Fortunes. Section 1640(a)(4) provides that for any violation of § 1639 (HOEPA violations), additional damages are warranted unless the creditor demonstrates that the failure to comply was not material. Again, the Court has found that

---

[65]For example, the Fortunes did not testify that they were unaware of the actual terms of the transaction, or that they would not have entered into the transaction had they been given the proper disclosures.

the failure to provide accurate disclosures at least three days prior to the consummation of the transaction was material in at least four ways. In addition, because the Fortunes are such low income debtors, the changes in the amounts they were required to pay were even more significant to them. It is certainly possible, for example, that had they been given these disclosures in advance, they would have discovered that they were exchanging a 9.5% interest loan for a 17.99% loan on their original home loan. This is exactly why Congress required these disclosures be provided enough in advance that consumers in high interest rate transactions resulting from an unsolicited visit to their home would have time to study the terms and hopefully make wise financial decisions.

Therefore, the Fortunes are entitled to damages against Community and American of $19,652.45, which represents the stipulated amount of the finance charges they paid to Community from the inception of the loan through November 20, 2009.[66] The total damages the Fortunes are entitled to recover from American and Community's violations of the TILA and HOEPA thus total $23,652.45. But any claim for damages is subject to a one year statute of limitations, which begins to run on the date in which the first payment under the transaction becomes due.[67] Because this adversary proceeding was initiated well beyond the one year statute of limitations, the Fortunes are not entitled to affirmatively collect these damages, with the exception of the $2,000 in statutory damages that arose as a result of Community's failure to timely act upon the notice of rescission.[68]

---

[66]*See* Pretrial Order (Doc. 47).

[67]15 U.S.C. § 1640(e).

[68]Because the violation of the TILA based upon the failure to comply with the procedures for rescission did not accrue until 20 days after the notice of rescission, which was January 8, 2010 at the latest, this claim is not barred by the 1 year statute of limitations and the Fortunes are entitled to actually collect those damages.

Even though the remaining damages cannot be affirmatively collected, they can be raised "as a matter of defense by recoupment or set-off" against Community's claims under the contract.[69] The rationale for this equitable recoupment rule is that the purposes of statutes of limitations are not served by allowing one party to enforce claims while denying the other's related defenses.[70] Community filed a proof of claim in this proceeding,[71] asserting a secured claim, and therefore the Fortunes can use recoupment to reduce or eliminate that claim.

### G.     Effect of rescission

The Court has found that the Fortunes' right to rescind was extended for a period of up to three years. The transaction in this case was consummated on January 11, 2007, and the notices signed by the Fortunes indicating their intent to rescind the transaction were mailed to Community on January 8, 2010, within the three year window. The Fortunes also included a notice of rescission in their Chapter 13 plan, which was served on Community on October 19, 2009, well within the three year period.[72] A notice is considered given when it is mailed.[73] Community does not contend this rescission notice was outside the three-year window, and the Court finds it was timely under the facts of this case.

---

[69]15 U.S.C. § 1640(e).

[70]*See, e.g., Burnett v. New York Cent. R.R.*, 380 U.S. 424, 428 (1965) (noting that policy behind statutes of limitations is to keep stale litigation out of the courts, not to preclude consideration of particular issues if litigation is properly before the court). If recoupment claims were barred, lenders could avoid TILA liability, and profit from their violations, simply by waiting until the expiration of the statute of limitations before bringing a foreclosure suit.

[71]Claim 9-1.

[72]Regulation Z § 226.23(a)(2) specifically provides the written notice of rescission does not have to be on the notice supplied under § 226.23(b). *See also Bilal v. Household Fin. Corp. (In re Bilal)*, 296 B.R. 828, 835 (D. Kan. 2003) (filing and sending creditor a Chapter 13 plan stating that debtors "hereby rescind" the transaction is sufficient).

[73]Reg. Z §§ 226.15(a)(2), 226.23(a)(2).

24

The effects of rescission are set forth in the TILA itself, as well as Regulation Z.[74] Regulation Z sets forth the effects of rescission, as follows:

(1)     When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2)     Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3)     If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4)     The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.[75]

By rescinding the transaction, the Fortunes are no longer obligated under the Contract, and Community is obligated to return to them any money they paid as a result of this transaction.

The parties have stipulated that the Fortunes paid Community a total of $21,235.62 in monthly payments. Community must return that amount to the Fortunes. In turn, the Fortunes must make a tender to Community equivalent to the reasonable value of the property that they obtained as a result of the transaction. Given the lack of other evidence presented in this case, the Court finds

---

[74]12 C.F.R. § 226.23.

[75]12 C.F.R. § 226.23(d).

that the property, services, and money received by the Fortunes were worth the contracted amount—$32,777.87—which reflects the cost of the siding, windows and doors, the labor to install those items, and the payoff of the amount owed to the VA.[76]  The Court will, therefore, offset the amount that Community must return to the Fortunes— $21,235.62, against the tender amount required by the Fortunes—$32,777.87, leaving a balance of $11,542.25 that the Fortunes are required to tender in order to effectively rescind this transaction.[77]

Although the Fortunes are required to tender $11,542.25 in order to effectuate the rescission, the Court has found that they are entitled to damages of $19,652.45 that can be offset against any claim Community has against them.  Because the amount of damages well exceeds the tender amount due, the Court finds that Debtors' tender obligation has been completely extinguished by the offset damages.  Debtors are not required to tender any amount of money to rescind this transaction. The rescission is complete, and Community is required to promptly release its security interest against the Fortune home.

Because the vast majority of the damages in this case were only allowed as a setoff, the only damages that Community is required to pay the Fortunes is the $2,000 statutory penalty for failing to comply with the rescission requirements.

### H.    Attorney Fees

---

[76] Mr. Fortune did testify that there were problems with the quality of the materials and/or workmanship, but there was nothing on the record to show the actual value of the work.  In addition, neither party introduced evidence by a witness who had any demonstrated expertise enabling the witness to make such a determination that the materials or workmanship were in fact faulty or reduced the value of the home.

[77] *See, e.g., Harris v. Tower Loan of Mississippi, Inc.*, 609 F.2d 120, 125 (5th Cir. 1980) and *Bilal v. Household Fin. Corp.,* 296 B.R. at 839 (holding that the return of money from the lender and the tender amount from the borrower may be offset, rather than requiring an actual turnover of funds by each party).

26

The Court is required to award attorney fees to a successful consumer in a TILA action.[78]

The Court orders Plaintiffs' counsel to provide to defendant's counsel, within 14 days, an accounting of the number of hours he claims he spent to achieve the favorable result, an accounting of any expenses incurred in prosecuting this action, as well as the amount of the hourly rate he claims he is entitled to receive based on the prevailing rate in the legal community for this level of legal skill and experience.[79] Defendant's counsel will then have 7 days to respond to this accounting. If the parties are unable to agree on the actual amount of attorney fees within 28 days, Plaintiffs' counsel is ordered to file motion, attaching time records, and Defendant's counsel will have 14 days to file a response. Plaintiff's counsel will then have 7 days to file a reply brief.

The Court will then decide whether a hearing on the issue is necessary, or whether the matter can be taken under advisement based on the briefs. If the parties do agree on the amount of attorney fees and expenses, they must submit an order to the Court for approval.

## III.     CONCLUSION

The Fortunes effectively rescinded the transaction with American, which was assigned to Community. As a result of this rescission, Community is required to release its mortgage against the Fortunes' home. Community and American are liable for penalties as a result of the violations of the TILA and HOEPA in connection with this transaction. Although the vast majority of those penalties are uncollectible because the claims were brought outside the one year statute of

---

[78] 15 U.S.C. § 1640(a)(3); *Herrera v. First Northern Sav & Loan Ass'n*, 805 F.2d at 902 (holding that plaintiffs as the prevailing parties in a TILA case are entitled to recover reasonable attorney's fees and costs).

[79] *See Lippoldt v. Cole*, 468 F.3d 1204, 1224-25 (10th Cir. 2006) (holding that when determining a reasonable rate for attorney fees, the court should consider "the prevailing market rate in the relevant community," for similar services by "lawyers of reasonably comparable skill, experience, and reputation").

27

limitations, they can nevertheless still be used to offset the Fortunes' statutory tender obligation, and that offset completely extinguishes that tender.

Community and American are liable for $2,000 in statutory penalties for not complying with its obligations upon receiving notice of the rescission, and judgment will be entered in favor of the Fortunes for that amount. Judgment will also be entered granting Plaintiffs their reasonable attorney fees pursuant to 15 U.S.C. § 1640(a)(3), and Community's objection to confirmation of Debtors' Chapter 13 plan is overruled.

**IT IS, THEREFORE, BY THE COURT ORDERED** that the consumer credit transaction entered into between the Plaintiffs and Defendants on January 11, 2007 is rescinded, and the Plaintiffs have no remaining obligation as a result of that transaction.

**IT IS FURTHER ORDERED** that Community Home Financial Services, Inc. is required to immediately release any claim or mortgage it may have against any real property owned by the Plaintiffs arising out of the transaction.

**IT IS FURTHER ORDERED** that judgment is entered against Community Home Financial Services, Inc. and in favor of Plaintiffs in the amount of $2,000.00 in statutory damages as a result of its violations of the TILA by failing to timely respond to the Plaintiffs' notice of rescission.

**IT IS FURTHER ORDERED** that Community Home Financial Services, Inc.'s objection to confirmation of Debtors' Chapter 13 plan is overruled.

###